# United States Tax Court

T.C. Memo. 2022-91

JOHANNES LAMPRECHT AND LINDA LAMPRECHT,
Petitioners

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

————

Docket No. 14410-15.                                    Filed August 31, 2022.

————

Ps are citizens of Switzerland who lawfully resided in the United States, where P–H worked as an investment consultant managing investments for himself and his clients. Ps filed U.S. income tax returns for 2006 and 2007 which understated their income in both years by omitting income that Ps treated as foreign sourced.

In 2008 the IRS issued to Swiss Bank a John Doe summons which sought to discover the identities of U.S. taxpayers using foreign entities and Swiss bank accounts to avoid reporting income on their U.S. tax returns.

In 2010 Ps filed amended returns for 2006 and 2007 on which they reported the previously omitted income. Upon examination of Ps' 2006 and 2007 returns, R determined an accuracy-related penalty under I.R.C. § 6662 against Ps for each year on the basis of the tax attributable to the income omitted from the original returns, and issued to Ps a notice of deficiency. Ps timely filed a petition to challenge the penalty determinations in the notice of deficiency, arguing (1) that the IRS failed to comply with I.R.C. § 6751(b)(1) requiring written supervisory approval of penalties, (2) that their amended returns for 2006 and 2007 are "qualified amended returns" within the meaning of Treas. Reg. § 1.6664-2(c)(3),

**Served 08/31/22**

[*2]  precluding penalty liability, and (3) that assessment of the accuracy-related penalties for 2006 and 2007 is barred by the statute of limitations under I.R.C. § 6501.

*Held*: The amended returns are not "qualified amended returns" under Treas. Reg. § 1.6664-2(c)(3)(i)(D) because they were filed after the service of a John Doe summons.

*Held, further*, assessment of the accuracy-related penalties is not barred by the statute of limitations under I.R.C. § 6501 because the limitations period was suspended by the service of the John Doe summons pursuant to I.R.C. § 7609(e)(2).

*Held, further*, the IRS complied with the written supervisory approval requirement of I.R.C. § 6751(b)(1).

*Held, further*, Ps are liable for the I.R.C. § 6662 accuracy-related penalties as determined by R for the 2006 and 2007 years.

————

*Lloyd De Vos*, for petitioners.

*Lindsey D. Stellwagen*, for respondent.

MEMORANDUM OPINION

GUSTAFSON, *Judge*:  This case is before the Court pursuant to section 6213(a)[1] for redetermination of accuracy-related penalties under

---

[1] Unless otherwise indicated, statutory references are to the Internal Revenue Code ("the Code", Title 26 of the United States Code) as in effect at the relevant times; references to regulations are to Title 26 of the Code of Federal Regulations ("Treas. Reg.") as in effect at the relevant times; and references to Rules are to the Tax Court Rules of Practice and Procedure.  Some dollar amounts are rounded.  Citation in this opinion to a "Doc." refers to a document so numbered in the Tax Court docket record of this case, and a pinpoint citation therein refers to the pagination as generated in the portable document format ("PDF") file.

[*3] section 6662(a) that the Internal Revenue Service ("IRS") determined against petitioners, Johannes and Linda Lamprecht, for the tax years 2006 and 2007. Pursuant to section 6212(a), the IRS mailed a statutory notice of deficiency ("NOD") to the Lamprechts on January 9, 2015, determining accuracy-related penalties under section 6662(a) of $124,294 for 2006 and $376,449 for 2007. The NOD determined these penalties on the basis of substantial understatements of income tax under section 6662(b)(2) and (d).[2] Both parties have moved for summary judgment under Rule 121, and the issues for decision are whether a genuine dispute of material fact exists with respect to: (1) whether the Lamprechts are liable for the accuracy-related penalties imposed by section 6662 for the 2006 and 2007 years, and, if so, (2) whether assessment of those penalties is barred by the statute of limitations under the provisions of section 6501. We hold that the Lamprechts are liable for the section 6662 accuracy-related penalties for 2006 and 2007 as determined by the Commissioner, and that assessment of the penalties is not barred by the statute of limitations. For the reasons stated below, we will grant the Commissioner's motion, deny petitioners' motion, and enter judgment for the Commissioner as a matter of law.

*Background*

The following facts are derived from the pleadings and the parties' respective motions, memorandums, and accompanying declarations (including the exhibits attached thereto). Unless noted otherwise, these facts are not in dispute.

*The Lamprechts' business activities*

The Lamprechts are, and have always been, citizens of Switzerland. In 2006 and 2007, they held visas entitling them to lawful permanent residence in the United States (i.e., "green cards"). The Lamprechts maintained residences in Tiburon, California, and St. Moritz, Switzerland, and periodically rented their St. Moritz residence to third parties.

Mr. Lamprecht worked in the United States as an investment consultant for Trais Fluors Investment Services, Inc. ("Trais Fluors"), a

---

[2] The NOD also determined, as an alternative basis for the penalties, negligence under section 6662(c), but we will grant the Commissioner's motion and sustain the penalties without reaching the issue of negligence. In his answer the Commissioner also asserted fraud penalties under section 6663, but he later conceded them.

[*4] California corporation for which he was both an officer and the sole shareholder. Mr. Lamprecht received a salary from Trais Fluors, as well as interest, dividends, and capital gains from his personal investment activities.

*Mr. Lamprecht and UBS*

In the years at issue, Mr. Lamprecht also received commissions from the Swiss bank UBS AG ("UBS") for referrals of business to it. The commissions were deposited into one of Mr. Lamprecht's UBS accounts. (As we set out below, the Lamprechts did not report these commissions on their original 2006 and 2007 Forms 1040, "U.S. Individual Income Tax Return", but did report them on their Forms 1040–X, "Amended U.S. Individual Income Tax Return".)[3]

Mr. Lamprecht is an owner of Paro, Inc. ("Paro"),[4] an entity incorporated under the laws of the British Virgin Islands. In the years at issue, Paro maintained a UBS bank account, of which Mr. Lamprecht was a beneficial owner.

*Departure from the United States*

Mr. Lamprecht departed the United States on December 9, 2009, and submitted U.S. Citizenship and Immigration Service Form I–407, "Abandonment of Lawful Permanent Resident Status", to the American Embassy in Bern, Switzerland, on December 21, 2009. Mr. Lamprecht also filed Form 8854, "Expatriation Information Statement", with the IRS in December 2010. Mrs. Lamprecht departed the United States on October 17, 2010, and surrendered her green card to the U.S. authorities in Switzerland on November 30, 2010.

---

[3] In opposition to the Commissioner's motion for summary judgment, the Lamprechts submitted, as Exhibit 15, a declaration by Mr. Lamprecht that stated: "the amounts that I reported on Schedule C[, "Profit or Loss From Business",] of my amended 2006 and 2007 tax returns . . . are commissions that I was paid by UBS A. G. ('UBS') for placing business with them. The amounts all appear on the UBS statements that . . . appear on Exhibit 13". That "Exhibit 13" appears in our record as Doc. 127.

[4] The parties disagree on the percentage of Mr. Lamprecht's ownership of Paro. The Lamprechts contend they own 100% of Paro as community property under the laws of the State of California. We need not resolve this dispute.

**[\*5]** *The Lamprechts' original 2006 and 2007 federal income tax returns*

The Lamprechts engaged a return preparer to prepare their original federal income tax returns for the 2006 and 2007 years, and they filed those returns early. The 2006 return is treated as having been filed on the due date in April 2007, and the 2007 return is treated as having been filed on the due date in April 2008. *See* § 6501(b)(1).

Their original 2006 return reported income totaling $1,073,761, and their original 2007 return reported income totaling $1,705,314. (As they now admit, and as we show below, that reporting was short by about $1 million for 2006 and about $5 million for 2007.) The original returns did not report income from commissions Mr. Lamprecht received from UBS (and that were deposited into his UBS accounts) or from foreign-source interest, dividends, and capital gains.[5] On Schedule A, "Itemized Deductions", to each return, they claimed itemized deductions.

On their original 2006 return on Schedule B, "Interest and Ordinary Dividends", Part III, "Foreign Accounts and Trusts", the Lamprechts completed line 7a ("At any time during 2006, did you have an interest in or a signature or other authority over a financial account in a foreign country, such as a bank account, securities account, or other financial account?") by putting an X in the "No" column. They left blank line 7b ("If 'Yes,' enter the name of the foreign country"). They did the same on their original 2007 return.

*The 2008 John Doe summons proceeding*

The Department of Justice ("DOJ") filed an "Ex Parte Petition for Leave to Serve John Doe Summons"[6] in the U.S. District Court for the Southern District of Florida, styled as "In the Matter of the Tax Liabilities of: John Does", No. 08-21864 (June 30, 2008). The petition

---

[5] The Lamprechts do not attribute these omissions to their paid return preparer, nor do they otherwise assert "reasonable cause" for their errors under section 6664(c). Mr. Lamprecht informed the IRS during examination that the reason for his non-reporting was that he "thought that 'everything Swiss was not taxable in the U.S.'" However, because we need not reach in this opinion the issues of negligence or fraud, we need not determine his subjective reasons for the errors.

[6] A "John Doe summons" is a third-party summons that "does not identify the person with respect to whose liability the summons is issued." § 7609(f).

**[*6]** requested authorization to serve a John Doe summons on UBS seeking information regarding the following class of persons:

> United States taxpayers, who at any time during the years ended December 31, 2002 through December 31, 2007, had signature or other authority . . . with respect to any financial accounts maintained at, monitored by, or managed through any office in Switzerland of UBS AG or its subsidiaries or affiliates and for whom UBS AG or its subsidiaries or affiliates (1) did not have in its possessions Forms W–9 executed by such United States taxpayers, and (2) had not filed timely and accurate Forms 1099 naming such United States taxpayers and reporting to United States taxing authorities all reportable payments made to such United States taxpayers.

Finding that the UBS John Doe summons met the requirements of section 7609(f), the district court authorized its service upon UBS by order dated July 1, 2008. UBS did not participate in this ex parte proceeding (nor did the Swiss government).

*Service of the summons on UBS*

The IRS served the John Doe summons on UBS on July 21, 2008, requesting records regarding: (1) the identities of U.S. taxpayers in the specified class; (2) foreign entities established or operated on behalf of each U.S. taxpayer in the class; (3) the opening of financial accounts, monthly or other periodic statements of activities of such accounts, and annual summaries of such accounts; and (4) referrals of each U.S. taxpayer in the class to UBS offices in Switzerland. The summons required appearance before the IRS in Miami, Florida, on August 8, 2008, for testimony and production of the requested records.

*The 2009 summons enforcement proceeding*

On February 19, 2009,[7] DOJ filed a petition in District Court for the Southern District of Florida to enforce the UBS John Doe summons,

---

[7] In this same general period, the IRS announced the Offshore Voluntary Disclosure Program ("2009 OVDP"). *See* Statement, IRS Newsroom, "Statement from IRS Commissioner Doug Shulman on Offshore Income" (Mar. 26, 2009), https://www.irs.gov/newsroom/statement-from-irs-commissioner-doug-shulman-on-offshore-income. Through the 2009 OVDP, taxpayers with previously unreported

**[\*7]** styled as *United States v. UBS AG*, No. 09-20423. The government of Switzerland joined in the enforcement suit as amicus curiae. The enforcement suit was ultimately resolved through two related out-of-court agreements, both executed August 19, 2009:

The first agreement, known as the "U.S.-Switzerland Agreement",[8] established an agreed mechanism for exchanging information that would "achieve the U.S. tax compliance goals of the UBS [John Doe] Summons while also respecting Swiss sovereignty." Under the U.S.-Switzerland Agreement, the IRS would deliver "a request for administrative assistance pursuant to Article 26 of the 1996 Convention Between the United States of America and the Swiss Confederation for the Avoidance of Double Taxation with Respect to Taxes on Income"[9] to the Swiss Federal Tax Administration ("SFTA") seeking information regarding accounts of U.S. taxpayers maintained at UBS in Switzerland.

The second agreement, known as the "U.S.-UBS Agreement", was the settlement agreement between the United States, the IRS, and UBS, by which the parties agreed to three terms pertinent to this opinion: First, as to the information sought by the summons, they agreed that UBS would produce the documents requested in the UBS John Doe summons to the SFTA on a rolling basis pursuant to an agreed-upon schedule and that UBS's compliance would be monitored by the Swiss Federal Office of Justice and the Swiss Financial Market Supervisory Authority.

---

offshore income could avoid potential criminal prosecution if they notified the IRS and met other conditions. Taxpayers who did not participate in the 2009 OVDP would be subject to the full extent of civil and criminal liability and all available penalties for each year. The extended deadline for taxpayers to participate in the 2009 OVDP was October 15, 2009. *See* IRS News Release IR-2009-84 (Sept. 21, 2009). The Lamprechts did not participate in the 2009 OVDP, and they have asserted in this case that the reason for their non-participation was that they were unable to obtain necessary documents from UBS, a contention that the Commissioner argued they are barred from making. The parties did not address the 2009 OVDP in their briefing of the cross-motions for summary judgment, so we do not address it further here.

[8] The U.S.-Switzerland Agreement does not appear in our record, but it is described in the second agreement discussed here—the U.S.-UBS agreement.

[9] *See generally* Convention for the Avoidance of Double Taxation with Respect to Taxes on Income, Switz.–U.S., Oct. 2, 1996, T.I.A.S. No. 97-1219.

**[\*8]**    Second, as to the summons enforcement case, the parties agreed to its dismissal and expressed their understanding about the effect of that dismissal.  They agreed as follows:

> Immediately upon the execution of this Settlement Agreement, and in no event more than 5 business days after its execution, UBS and the United States will file a Stipulation of Dismissal, pursuant to Fed. R. Civ. P. 41(a)(l)(A)(ii), with the United States District Court for the Southern District of Florida. . . .  The Parties understand that the dismissal of the Action pursuant to this paragraph 1 shall, in and of itself, have no effect on the UBS Summons or its enforceability.

Third, as to the UBS John Doe summons itself, the parties agreed that the IRS would "withdraw with prejudice" the UBS John Doe summons *after* receiving information concerning bank accounts from UBS pursuant to the treaty request for administrative assistance.  However, the parties agreed that "if UBS fails to comply in any material respect with any of its obligations" to produce information, then "the IRS is not obligated to withdraw the UBS Summons".  That is, under this agreement, although the summons enforcement *suit* would be promptly dismissed, the *summons itself* would remain pending and potentially enforceable until it was "withdrawn with prejudice" after UBS provided the information.

The IRS formally withdrew the UBS John Doe Summons, "with prejudice", on November 15, 2010.  Information produced by UBS in response to the John Doe summons included the Lamprechts' account information.

*The Lamprechts' amended 2006 and 2007 federal income tax returns*

In December 2010—after UBS had given its information to the IRS and the John Doe summons had been withdrawn—the Lamprechts filed amended federal income tax returns for the 2006 and 2007 years, which were prepared by a paid preparer.  On the amended returns, the Lamprechts reported their previously unreported income.  Certain amounts they reported on their original and amended returns for 2006 and 2007 compare as follows:

| [*9] Item | 2006 original | 2006 amended | 2007 original | 2007 amended |
|---|---|---|---|---|
| Adjusted gross income | $1,073,652 | $2,816,833 | $1,705,172 | $6,930,169 |
| Itemized deductions | 187,338 | 152,481 | 202,497 | 128,460 |
| **Total tax** | **240,393** | **861,864** | **461,798** | **2,344,041** |

Thus, the amended returns showed increases in tax liability of $621,471 for 2006 and $1,882,243 for 2007. On lines 7a and 7b of Schedule B to their amended returns, the Lamprechts answered "Yes" to the question whether they had an interest in "a financial account in a foreign country" and entered "Switzerland" as the name of the foreign country. The Lamprechts concurrently filed Forms TD F 90-22.1, "Report of Foreign Bank and Financial Accounts" ("FBAR"),[10] for 2006 and 2007 to report previously undisclosed foreign bank accounts.

When they filed their amended returns in December 2010, the Lamprechts paid the increased tax liabilities for 2006 and 2007 that they reported. (They did not report a liability for penalties nor pay them.)

*IRS examination*

The Lamprechts' 2010 federal income tax return, filed in or before April 2011, was selected for examination and was assigned to Revenue Agents ("RA") Norbert Nyereyemhuka and Sandra Lyons. The Lamprechts did not participate in the examination of their federal income tax return by phone conference—only through their attorney, Mr. De Vos, who traveled to Dallas, Texas, in September 2014, for a meeting with the examiners.

In a Form 4564, "Information Document Request", dated December 12, 2013, RA Nyereyemhuka requested that the Lamprechts provide copies of their original and amended tax returns for the 2003, 2004, 2005, 2006, 2007, and 2008 years. On February 12, 2014, RA Nyereyemhuka submitted to his immediate supervisor, Robert Davis, a Form 5345–D, "Examination Request-ERCS (Examination Returns Control System) Users", requesting that the Lamprechts' return for the 2007 year be opened for examination for the purpose of assessing the section 6662 accuracy-related penalty. The form states,

---

[10] Form TD F 90-22.1 was the appropriate FBAR form for 2006 and 2007, but it was replaced by FinCEN Form 114 starting in January 2014.

**[*10]** as the "Reason for Request: To open up 2007 tax year to *assess* penalties on amended return that does not meet the qualified amended return criteria." (Emphasis added.) The form then states: "Follow-Up Actions: Open up tax year / *Assess* accuracy penalty." (Emphasis added.) Mr. Davis approved RA Nyereyemhuka's request by signing the form. RA Nyereyemhuka made an identical request to open the Lamprechts' return for the 2006 year for examination to assess the section 6662 accuracy-related penalty via a Form 5345–D dated April 10, 2014, which Acting Supervisory Revenue Agent Michael Anderson approved that same day by signing the form.

The IRS first communicated to the Lamprechts its determination that they were liable for the section 6662 accuracy-related penalties for the years 2006 and 2007 in a Letter 950 dated July 18, 2014, which included copies of Form 4549, "Income Tax Examination Changes", and Form 886–A, "Explanation of Items", detailing the facts and law supporting its determination.

RA Nyereyemhuka's group manager later signed a "Civil Penalty Approval Form" dated November 4, 2014, again approving assessment of the section 6662 accuracy-related penalties against the Lamprechts for the 2006 and 2007 years.

*The Statutory Notice of Deficiency for 2006 and 2007*

On January 9, 2015, the IRS mailed to the Lamprechts an NOD determining the section 6662 accuracy-related penalties for 2006 and 2007. Attached to the NOD were Forms 4549–A, "Income Tax Examination Changes", determining section 6662 accuracy-related penalties for 2006 and 2007, and Form 886–A providing RA Nyereyemhuka's analysis of the facts and law supporting his decision to assert section 6662 accuracy-related penalties for 2006 and 2007.

*The Lamprechts' petition*

The Lamprechts challenged the IRS's determination by timely filing a petition with the Tax Court. When they filed their petition, the Lamprechts resided in Switzerland.[11] The Lamprechts do not dispute the arithmetic of the IRS's calculations of the accuracy-related penalties

---

[11] Absent stipulation pursuant to section 7482(b)(2), venue for an appeal in this case would be the U.S. Court of Appeals for the District of Columbia. *See* § 7482(b)(1).

**[*11]** for 2006 and 2007 as shown on the NOD, but they dispute the applicability of those penalties. The petition makes two primary contentions challenging the accuracy-related penalties. First, the petition claims that the Lamprechts fixed their own errors and should not be penalized. It contends that their amended returns for 2006 and 2007 are "qualified amended returns" within the meaning of Treasury Regulation section 1.6664-2(c)(3), and that therefore there is no underpayment to which the accuracy-related penalties may apply. Second, the petition claims that assessment of the accuracy-related penalties for 2006 and 2007 is barred by the statute of limitations under section 6501.

*The parties' cross-motions for summary judgment*

Following a lengthy series of discovery disputes,[12] the Commissioner filed his motion for summary judgment, and the Lamprechts cross-moved. Stated simply, the issue for decision is whether the Lamprechts are liable for 20% accuracy-related penalties (under section 6662(a)) for "substantial understatements" of tax (under section 6662(b)(2)) on their original returns for 2006 and 2007.[13] The Lamprechts do not dispute that the understatements on their original returns were "substantial" (i.e., exceeding the greater of 10% of their tax or $5,000, *see* § 6662(d)), and they do not raise a defense of "reasonable basis" under section 6662(d)(2)(B)(ii)(II) nor "reasonable cause" under section 6664(c). Rather, they make three other contentions, any one of which would carry the day.

First, the Lamprechts contend that the "initial determination" of the penalties was not given written supervisory approval as required by section 6751(b)(1) (an issue not raised in the petition, but on which the Commissioner bears the burden of production). Second, the Lamprechts contend (as in their petition) that their amended returns were "qualified amended returns" that cured their errors and preclude penalty liability. And third, they continue to contend that the statute of limitations bars the assessment of the determined penalties. These are the issues that we address in this opinion.

---

[12] See our orders appearing in the docket record as Docs. 61, 90, 108, 131, 150, and 155.

[13] The Commissioner also maintains his alternative position that the penalties are warranted by "negligence" under section 6662(b)(1), but he does not assert that more fact-intensive contention in his motion for summary judgment.

**[*12]**                                    *Discussion*

I.      *General principles of law*

    A.      *Jurisdiction*

The Lamprechts' petition was filed pursuant to section 6213(a), which grants the Court jurisdiction to redetermine a deficiency in federal income tax as determined in an NOD. However, the Lamprechts paid their increased federal income tax liabilities for 2006 and 2007 when filing their amended returns, and the only liabilities at issue are the section 6662 accuracy-related penalties. Section 6665(a) provides that "the . . . penalties provided by this chapter [68, titled "Additions to Tax, Additional Amounts, and Assessable Penalties"] shall . . . be assessed, collected, and paid in the same manner as taxes", and further that "any reference in this title [26 U.S.C.] to 'tax' imposed by this title shall be deemed also to refer to the additions to the tax, additional amounts, and penalties provided by this chapter." Under these provisions the Commissioner's determination that the Lamprechts are liable for the section 6662 accuracy-related penalties for 2006 and 2007 is equivalent to his determining a deficiency in federal income tax for those years; and upon the timely filing of their petition, we have jurisdiction to redetermine that deficiency. *See* §§ 6213(a), 6665(a).

    B.      *Summary judgment*

The purpose of summary judgment is to expedite litigation and avoid unnecessary trials. *Fla. Peach Corp. v. Commissioner*, 90 T.C. 678, 681 (1988). The Court may grant summary judgment when there is no genuine dispute as to any material fact and a decision may be rendered as a matter of law. Rule 121(b); *Sundstrand Corp. v. Commissioner*, 98 T.C. 518, 520 (1992), *aff'd*, 17 F.3d 965 (7th Cir. 1994).

The moving party bears the burden of showing that no genuine issue of material fact exists, and the Court will view any factual material and inferences in the light most favorable to the nonmoving party. *Dahlstrom v. Commissioner*, 85 T.C. 812, 821 (1985). Since we will grant the Commissioner's motion for summary judgment, we will draw inferences in favor of the Lamprechts.

    C.      *Accuracy-related penalty*

Section 6662(a) imposes an "accuracy-related penalty" equal to 20% of the portion of the underpayment that is attributable to various

**[\*13]** factors, including a "substantial understatement of income tax". § 6662(b)(2). For the purposes of section 6662(b)(2) and (d)(1)(A), an understatement[14] of income tax is "substantial" if it exceeds the greater of "10 percent of the tax required to be shown on the return" or $5,000. § 6662(d)(1)(A). There is no dispute that the understatements on the Lamprechts' original returns for 2006 and 2007 were substantial, by comparison to the corrected amounts that the Lamprechts themselves reported on their amended returns.

The Commissioner bears the burden of production with respect to the liability of an individual for any penalty. § 7491(c). To satisfy his burden, the Commissioner must present sufficient evidence to show that it is appropriate to impose the penalty in the absence of available defenses. *See Higbee v. Commissioner*, 116 T.C. 438, 446 (2001). Once the Commissioner meets his burden of production on penalties, the taxpayer must come forward with persuasive evidence that the Commissioner's showing is incorrect. Rule 142(a); *Higbee*, 116 T.C. at 447.

Compliance with the written supervisory approval requirement of section 6751(b)(1) is an element of the Commissioner's burden of production on penalties. *Graev v. Commissioner*, 149 T.C. 485, 493 (2017), *supplementing and overruling in part* 147 T.C. 460 (2016). Section 6751(b)(1) provides:

> No penalty under this title [26 U.S.C.] shall be assessed unless the initial determination of such assessment is personally approved (in writing) by the immediate supervisor of the individual making such determination or such higher level official as the Secretary may designate.

As the Tax Court has construed section 6751(b)(1), it requires written supervisory approval to be obtained before the IRS formally communicates to the taxpayer its determination that the taxpayer is liable for the penalty. *Clay v. Commissioner*, 152 T.C. 223, 249 (2019), *aff'd*, 990 F.3d 1296 (11th Cir. 2021).[15] The IRS's compliance with

---

[14] An "understatement" is defined as the excess of the amount of tax required to be shown on the return over the amount of tax which is shown on the return. § 6662(d)(2)(A).

[15] Formal communication of an IRS penalty determination implicating section 6751(b)(1) may come in any one of multiple forms. In *Clay*, 152 T.C. at 249, we

**[\*14]** section 6751(b)(1) is appropriately considered in a deficiency case. *See Graev*, 149 T.C. at 493. And if, in so considering, we conclude that the IRS failed to secure written supervisory approval for a penalty subject to section 6751(b)(1), then we cannot sustain the penalty. *See id.*

D.    *Summons enforcement*

"For the purpose of ascertaining the correctness of any return . . . [or] determining the liability of any person for any internal revenue tax," section 7602(a)(2) authorizes the Secretary of the Treasury ("the Secretary"), acting through the IRS, to summon

> any person having possession, custody, or care of books of account containing entries relating to the business of the person liable for tax . . . to appear before the Secretary at a time and place named in the summons and to produce such books, papers, records, or other data, and to give such testimony, under oath, as may be relevant or material to such inquiry.

Where the summons identifies the person as to whose tax liability the information is sought, the IRS issues the summons without any court involvement. However, where the IRS needs information from a third party about the tax liability of a person whose identity it does not yet know, it may attempt to obtain that information from the third party by means of a "John Doe summons", i.e., a summons "which does not

___

held "that the initial determination for purposes of section 6751(b) was . . . when respondent issued the RAR [revenue agent's report] to petitioners proposing adjustments including penalties and gave them the right to protest those proposed adjustments." Written supervisory approval must precede the IRS's initial formal communication of a penalty determination to an individual taxpayer, regardless of the means of communication. In considering supervisory approval of an assessable penalty under section 6707A, the Court of Appeals for the Ninth Circuit construed section 6751(b)(1) differently from the Tax Court, so that the burden on the IRS was less demanding. *See Laidlaw's Harley Davidson Sales, Inc. v. Commissioner*, 29 F.4th 1066, 1070–1071, 1071 nn.4 & 5 (9th Cir. 2022) (rejecting this Court's formal communication standard for the section 6707A penalty for failure to report participation in a listed transaction, and indicating that the initial determination in a deficiency case is likely embodied in the NOD), *rev'g* 154 T.C. 68 (2020). Although this case is not appealable to the Ninth Circuit, *see* § 7482(b)(1), even if we applied the Ninth Circuit's reasoning in *Laidlaw's* the Commissioner would still meet his burden of production to show compliance with the supervisory approval requirement of section 6751(b)(1). We therefore have no occasion here to reconsider our opinions in *Laidlaw's* or *Clay*.

**[\*15]** identify the person with respect to whose liability the summons is issued." § 7609(f). Before the Secretary can serve a John Doe summons, section 7609(f) requires him to establish the following in a court proceeding:[16]

> (1) the summons relates to the investigation of a particular person or ascertainable group or class of persons,

> (2) there is a reasonable basis for believing that such person or group or class of persons may fail or may have failed to comply with any provision of any internal revenue law, and

> (3) the information sought to be obtained from the examination of the records or testimony (and the identity of the person or persons with respect to whose liability the summons is issued) is not readily available from other sources.

Pursuant to section 7609(h)(1), "the United States district court for the district within which the person to be summoned resides or is found shall have jurisdiction to hear and determine any proceeding brought under subsection . . . (f) [regarding issuance of a John Doe summons]." That proceeding for approval of a John Doe summons is "ex parte", and the court's determinations are "made solely on the petition and supporting affidavits." § 7609(h)(2).

When a summons is served, the receiving party may sometimes voluntarily provide the requested information, and in that circumstance the summons will never be judicially enforced. But if the recipient does not produce the requested information, then section 7402(b) authorizes the United States to bring suit in the appropriate district court to enforce the summons, if necessary.

### E.    *Statute of limitations for assessment of tax*

Section 6501(a) provides the general rule that "the amount of any tax imposed by this title [26 U.S.C.] shall be assessed within 3 years after the return was filed." There is, however, an exception to this general 3-year rule in the case of substantial omissions from gross

---

[16] In such a proceeding, the Secretary is represented by the DOJ, pursuant to 28 U.S.C. § 516.

**[\*16]** income under section 6501(e)(1)(A). For the purposes of section 6501(e)(1)(A), an omission from gross income is "substantial" if it is "in excess of 25% of the amount of gross income stated in the return"—the circumstance that the Lamprechts acknowledge exists here. Where there is a substantial omission from gross income, section 6501(e)(1)(A) provides that "the tax may be assessed . . . at any time within 6 years after the return was filed." The parties agree that this 6-year period of limitation applies in this case.

Additionally, section 7609(e) suspends the period of limitations for assessment of tax if a summons was issued but remains unresolved. Section 7609(e)(2) reads:

> (2) Suspension After 6 Months of Service of Summons.—In the absence of the resolution of the summoned party's response to the summons, the running of any period of limitations under section 6501 . . . with respect to any person with respect to whose liability the summons is issued . . . shall be suspended for the period—

> > (A) beginning on the date which is 6 months after the service of such summons, and

> > (B) ending with the final resolution of such response.

Accordingly, if the IRS serves a summons, and that summons is not resolved within six months of service, then the period of limitations for assessment under section 6501 is suspended from the six-month anniversary of service of the summons until its final resolution. (The parties disagree about whether such a suspension occurred in this case.)

II.  *Analysis*

The Lamprechts' amended returns reported tax liabilities of $665,400 for 2006 and $2,031,194 for 2007, whereas their original returns reported tax liabilities of $43,929 for 2006 (understating the tax by $621,471) and $148,951 for 2007 (understating the tax by $1,882,243). Because the Lamprechts' understatements of income tax on their original returns greatly exceed 10% of the tax required to be shown (i.e., the tax eventually reported on their amended returns), those understatements are "substantial" and are therefore subject to the accuracy-related penalty of section 6662(a) and (b)(2). *See* § 6662(d). Arithmetically speaking, the parties agree on the amounts of the

**[\*17]** accuracy-related penalties for the 2006 and 2007 years as calculated by reference to the tax on the original returns. However, the Lamprechts dispute their liability on the grounds that we now discuss.

### A.    *Written supervisory approval under section 6751(b)(1)*

Because the only liabilities at issue in this case are penalties, the Commissioner bears the burden of production. *See* § 7491(c). As we have noted, the Commissioner's burden of production also includes the burden to show compliance with the requirement of section 6751(b)(1) that the "initial determination" of the penalty be approved in writing by the "immediate supervisor".

### 1.    *The Commissioner's showing*

The IRS first formally communicated its determinations of section 6662 accuracy-related penalties to the Lamprechts in the Letter 950, dated July 18, 2014, which included an examination report showing proposed changes to the Lamprechts' 2006 and 2007 tax returns. (The Lamprechts do not point to any previous communication that could have embodied the "initial determination".) Section 6751(b)(1) is satisfied where written supervisory approval of the "initial determination" of the penalty is obtained before the first formal communication of the penalty determination to the taxpayer. *Clay*, 152 T.C. at 249. To show that such approval was obtained here, the Commissioner proffers Forms 5345–D, which state that the "Reason" for opening the Lamprechts' 2006 and 2007 returns for examination was "to *assess* penalties on amended return that does not meet the qualified amended return criteria", and that the "Follow-up Actions" would be to "Open up tax year" and "*Assess* accuracy penalty"—i.e., the section 6662 accuracy-related penalty. (Emphasis added.) This form sufficiently identifies the penalty being determined, the reasoning for doing so, and the proposal that it is to be "assess[ed]", thereby demonstrating an initial determination that the Lamprechts were liable for section 6662 accuracy-related penalties for 2006 and 2007. The Forms 5345–D bear the immediate supervisors' signatures, and they are dated February 12, 2014 (for the 2007 approval), and April 10, 2014 (for the 2006 approval), which both predate the Letter 950 issued in July 2014. Because the Forms 5345–D reflect initial determinations of the Lamprechts' liability for the section 6662 accuracy-related penalties for 2006 and 2007 and predate the first formal communication of the penalties to the Lamprechts, the Commissioner has met his burden of production to show compliance with section 6751(b)(1).

**[\*18]**      2.      *The Lamprechts' criticisms*

The Lamprechts resist this conclusion with three criticisms that are not well grounded:

a.      *The nature of Form 5345–D*

First, the Lamprechts complain that Form 5345–D, which is used to open an examination, is not properly used for supervisory approval of a penalty.  It is true that Internal Revenue Manual ("IRM") 20.1.5.1.6(4) (Jan. 24, 2012) suggests that "written managerial approval . . . should be documented on the *Civil Penalty Approval*, leadsheet"; but three considerations must be kept in view:  First, it is also true that in certain circumstances the IRM expressly stated that Form 5345–D is used to secure supervisory approval of certain penalties.[17]  Second, "[i]t is a well-settled principle that the Internal Revenue Manual does not have the force of law, is not binding on the IRS, and confers no rights on taxpayers."  *See, e.g.*, *McGaughy v. Commissioner*, T.C. Memo. 2010-183, 100 T.C.M. (CCH) 144, 148.  Third, we have held that no particular form is required for written supervisory approval under section 6751(b)(1).  *See, e.g.*, *Palmolive Bldg. Invs., LLC v. Commissioner*, 152 T.C. 75, 86 (2019).  The Commissioner made a showing that, for each year at issue, the form twice expressly requested approval to open an examination "to *assess* penalties on amended return" and to "[*a*]*ssess* accuracy penalty".  (Emphasis added.)  The forms that the examining agent produced thus reflected not just a request to start an examination but rather his initial determinations to assess penalties, and those initial determinations were approved by the signatures of his supervisors before formal communication of those determinations to the Lamprechts.  The Lamprechts raise no "genuine dispute" as to these facts.

---

[17]  *See, e.g.*, IRM 20.1.12.6(1) (Aug. 27, 2010) ("If the examiner determines a penalty [applicable to incorrect appraisals] is warranted, the examiner will prepare Form 5345–D . . . and secure the group manager's approval"); IRM 4.32.2-12 (June 8, 2012) ("Use Form 5345–D . . . to establish each tax year there will be a penalty assessed"); IRM 4.24.16.1.11 (Sept. 12, 2013) (establishing that supervisory approval of proposed penalties in excise tax examinations is given using Form 5345–D).  The IRM is a sprawling instruction manual, the various parts of which are amended at different times, and its penalty-related provisions are scattered throughout.  The year after these Forms 5345–D were signed, the IRM included an express provision that examiners "gain their manager's approval to open a penalty case" (the action taken by Form 5345–D) "[a]fter [the] examiners *determine that a penalty is warranted*."  IRM 20.1.9.2.1(1) (July 8, 2015) (emphasis added).

**[\*19]**                  b.     *The IRS's handling of Form 5345–D*

Second, the Lamprechts question the sequence of events. They point out that electronic time-stamps of the digital signatures on the Forms 5345–D show that the supervisors signed the forms *before* the agent who made the initial determination of the penalty, and they contend that a "manager cannot approve an action which has not yet taken place." This scrutiny of the process is misdirected. Section 6751(b)(1) requires a signature from the supervisor approving the penalty, not from the individual making the initial determination. *See Palmolive Bldg. Invs., LLC*, 152 T.C. at 86 ("The statute does not require any particular writing by the individual making the penalty determination, nor any signature or written name of that individual"). If the examiner signs the form at all (as to which section 6751(b)(1) is indifferent), it does not matter whether he does so before he submits the document to the supervisor or afterwards when he then moves the process along.

                  c.     *The Commissioner's discovery responses*

Third, the Lamprechts argue that, even if these Forms 5345–D would otherwise satisfy the Commissioner's burden of production under section 6751(b)(1), we should preclude the Commissioner from relying on these documents. The Forms 5345–D were first produced to the Lamprechts on February 12, 2021, when the Commissioner filed his motion for summary judgment. The Lamprechts say that he failed to produce them earlier in response to a discovery request or in response to our order ruling on their motion to compel production of documents, and they ask us therefore to preclude the Commissioner from relying on them now. This argument ostensibly implicates the important subjects of a litigant's duty to respond conscientiously and honestly to his opponent's discovery requests and the necessity of the Court's enforcing its discovery rules and orders—with preclusive sanctions, where appropriate. However, the Lamprechts' contentions do not fairly present the document request or our order on the motion to compel.

                  i.     *Document Request No. 7*

The document request that the Lamprechts rely on did not expressly request Forms 5345–D, nor did it more generally request documents to be relied on to show compliance with section 6751(b)(1) (a subject that the Lamprechts addressed in a roughly contemporaneous motion for summary judgment). Rather, Document Request No. 7

**[\*20]** requested "[a]ll documents on which you intend to rely at trial." However, because we will grant the Commissioner's motion for summary judgment, there will be no trial in this case, and the set of documents to be "rel[ied on] at trial" will be an empty set.

Moreover, Document Request No. 7 is very broad, difficult for even a conscientious recipient to respond to comprehensively when a case is not yet ready for trial. What a party will rely on at trial will depend on (among other things) what the party learns or obtains before that trial, what the parties will stipulate under Rule 91, what the party-opponent eventually disputes, and what the Court holds in pretrial orders. In the Tax Court, the final deadline to announce the exhibits to be offered at trial is provided in a Standing Pretrial Order (which was issued in this case on two previous occasions when trial dates were set but later continued) that gives a deadline for the pretrial exchange of all documents to be used at trial. Of course, a party is entitled to obtain documents, through discovery, ahead of that deadline; but discovery requests should seek specific information, rather than simply attempting to revise the Court's schedule and move up the deadline for the disclosure of all trial exhibits.

ii.     *Motion to compel and order*

The Lamprechts invoke our order with the following contention:

18.     By its order entered on September 26, 2017, the Court ordered Respondent to produce certain classes of documents requested by Petitioners and not previously produced by Respondent. The Court further stated "The Court would expect to preclude Respondent from relying at trial upon any responsive document not produced by October 13, 2017". . . .

. . . .

20.     Respondent did not produce the Forms 5345–D by October 13, 2017.

21.     Respondent did not produce the Forms 5345–D on or reasonably after February 20, 2018, the date on which he stated that he had written managerial approval for the substantial understatement penalty that satisfied the requirements of Section 6751(b)(1). . . .

**[\*21]**      22.      Respondent never produced the Forms 5345–D in discovery.

23.      Consistent with the Order of the Court, Respondent should be precluded from relying upon the Forms 5345–D to prove compliance under Section 6751(b) because the documents were not produced by October 13, 2017 or a reasonable time thereafter.

It was not incorrect for the Lamprechts to say that we ordered production of "certain classes of documents"—but those classes did not include "[a]ll documents on which you intend to rely at trial" (their Request No. 7).  Rather, we ordered

> that petitioners' motion to compel production of documents is denied, except that it is granted . . . [as to certain documents requested in] Request No. 1 . . . .  The Court would expect to preclude respondent from relying at trial upon any responsive document not produced by October 13, 2017.

That is, our order denied the Lamprechts' motion to compel production of documents as to Request No. 7 (the request with which they allege the Commissioner failed to comply), and the preclusion (at trial) of which we warned related to the responsive documents that we did compel.  Seeing no violation of our order, we will not preclude the Commissioner from relying on the Forms 5345–D to show compliance with section 6751(b)(1).

Since there is no genuine dispute, for purposes of Rule 121(b), that the Commissioner has met his burden of production as to written supervisory approval, we turn to the Lamprechts' other two contentions.

### B.      *"Qualified amended returns"*

#### 1.      *Definition and effect*

A penalty-generating "substantial understatement" under section 6662(d)(1)(A) is determined by reference to "the amount of the tax imposed which is shown on the return".  § 6662(d)(2)(A)(ii).  An amount not "shown on the return" may yield a penalty.  The Lamprechts argue that we should look not to the amounts of tax shown (and not shown) on their original returns but rather to the amounts of tax shown on their *amended* returns for 2006 and 2007, which reported their entire

**[\*22]** liabilities and reflected no understatements. The Lamprechts contend that these are "qualified amended returns" within the meaning of Treasury Regulation section 1.6664-2(c)(3)[18] and as such are the proper basis for reckoning whether there was an underpayment to which the section 6662 accuracy-related penalty may apply. Section 1.6664-2(c)(2) provides: "The amount shown as the tax by the taxpayer on his return includes an amount shown as additional tax on a qualified amended return (as defined in paragraph (c)(3) of this section)"; and if the Lamprechts' amended returns are "qualified amended returns" as they contend, then they indeed made no "understatement" (under section 6662(b)(2)) that gave rise to an "underpayment" (under section 6662(a)).

The Commissioner contends that the amended returns were not "qualified amended returns" because they were filed after the issuance of the UBS John Doe summons.[19] He relies for this contention on Treasury Regulation section 1.6664-2(c)(3)(i), which defines a "qualified amended return" thus:

> A qualified amended return is an amended return . . . *filed* after the due date of the return for the taxable year (determined with regard to extensions of time to file) and *before* the earliest of–
>
> . . . .
>
> (D)(*1*) *The date on which the IRS serves a summons described in section 7609(f)* [i.e., a John Doe summons] relating to the tax liability of a person, group, or *class that includes the taxpayer . . .* with respect to an activity for which the taxpayer

---

[18] Treasury Regulation section 1.6664-2(c) was a temporary regulation in 2006, *see* Treas. Reg. § 1.6664-2T (2006), and was finalized on January 8, 2007, *see* T.D. 9309, 2007-1 C.B. 497. The temporary and final versions contain the same text and are nearly identical in format. The final version is reproduced here.

[19] The Lamprechts "[a]ssum[e] for purposes of this argument that the UBS Summons was a valid and enforceable summons", Doc. 163, para. 48; and they refer in a footnote, *id*. n.2, to their "discussion of whether the UBS Summons was a valid and enforceable summons" which is given in connection with the statute-of-limitations issue. We follow their lead and discuss the validity of the summons in the statute-of-limitations context. But if they mean to apply the invalidity argument to this "qualified amended return" issue also, then we reject that argument in this context for the reasons we discuss below in part II.C in the context of the statute of limitations.

[*23]       *claimed any tax benefit* on the return directly or indirectly.

　　　　(*2*) The rule in paragraph (c)(3)(i)(D)(*1*) of this section applies to any return on which the taxpayer claimed a direct or indirect tax benefit from the type of activity that is the subject of the summons, regardless of whether the summons seeks the production of information for the taxable period covered by such return . . . .

(Emphasis added.)

In this case the IRS served the UBS John Doe summons on July 21, 2008, but the Lamprechts did not file their amended returns until December 2010—long after service of the summons. Therefore, if the UBS John Doe summons met the terms of subparagraph (3)(i)(D)(*1*), then the Lamprechts' amended returns fail to qualify.

### 2.    *"[C]lass that includes the taxpayer"*

That UBS John Doe summons clearly "relat[ed] to the tax liability of a person, group, or class that includes the taxpayer": It sought information regarding U.S. taxpayers with signature or other authority over accounts maintained at UBS in Switzerland for whom UBS did not have on file a Form W–9, "Request for Taxpayer Identification Number and Certification", and did not issue Forms 1099 for tax years 2002 through 2007. Consequently, the Lamprechts are clearly within the "class" of persons identified in the UBS John Doe summons because: (1) they were U.S. taxpayers; (2) Mr. Lamprecht maintained at UBS personal and business accounts over which he had signature authority; (3) unreported income was deposited into those accounts; and (4) the Lamprechts do not allege that UBS either had a Form W–9 on file for Mr. Lamprecht or issued to him a Form 1099 reporting income he received from UBS.

### 3.    *"[C]laimed any tax benefit"*

The Lamprechts argue, however, that they did not (in the words of subparagraph (3)(i)(D)(*2*) of the regulation) "claim[] a direct or indirect tax benefit from the type of activity that is the subject of the [UBS John Doe] summons". According to the Lamprechts, in order to "claim[] a . . . tax benefit" one must make "some affirmative statement on the tax return that the taxpayer is entitled to the tax benefit claimed

**[\*24]** [or] there must be some misstatement on the return itself that causes the understatement of tax liability." The Lamprechts would have us distinguish "between a person who omits items or gains from his tax return and a person who claims a tax benefit on their tax return," and would have us hold that a taxpayer who omits substantial items of gross income on his return does not thereby "claim[] a tax benefit".

In our view this argument for a narrow construction triggered only by an "affirmative statement" or "misstatement" is not supported by the text of the regulation nor by the caselaw and is not actually borne out in the facts of the Lamprechts' returns.

a.  *The text of the regulation*

Treasury Regulation section 1.6664-2(c)(3)(i)(D)(*1*), as quoted above, establishes that, in order to be considered a "qualified amended return", the amended return must be filed before "[t]he date on which the IRS serves a [John Doe] summons . . . relating to the tax liability of a . . . class that includes the taxpayer . . . with respect to an activity for which the taxpayer *claimed any tax benefit* on the return directly or indirectly." Example 5 of Treasury Regulation section 1.6664-2(c)(5) shows the application of that principle and illustrates our issue. In Example 5, the IRS serves a section 7609(f) John Doe summons on a credit card company requesting the identities of, and information concerning, U.S. taxpayers who had signature authority over credit cards issued by, through, or on behalf of certain offshore financial institutions. The credit card company provides information about the taxpayer in response to the John Doe summons. The taxpayer files an amended return showing increased tax liability before the IRS contacts him concerning an examination of his income tax return, but *after* the John Doe summons had been served on the credit card company. Example 5 concludes that, "[u]nder paragraph (c)(3)(i)(D) of this section, the amended return is not a qualified amended return because it was not filed before the John Doe summons was served on [the credit card company]." In Example 5 the only difference described as having been reported on the amended return is "an increase in . . . Federal income tax liability", so that the only "tax benefit . . . claimed" on the original return was (by implication) a lower income tax liability.

Here, the UBS John Doe summons sought information about U.S. taxpayers who were underreporting gross income using foreign entities and offshore UBS accounts. The Lamprechts understated their gross income for 2006 and 2007 by omitting all foreign source income from

[*25] their tax returns, and accordingly they claimed a tax benefit, either directly by maintaining implicitly that they were entitled to the section 911 foreign earned income exclusion (discussed below), or indirectly by understating their tax liabilities and receiving tax savings through underpayments. Because the Lamprechts were members of the class of persons targeted by the UBS John Doe summons, claimed a tax benefit either directly or indirectly with respect to the activity identified in the UBS John Doe summons, and did not file their amended returns before the UBS John Doe summons was served, their amended returns for 2006 and 2007 are not "qualified amended returns"; and therefore, the reporting on those amended returns of the originally omitted income and the resulting additional tax does not result in that additional tax being included in the Lamprechts' "amount shown as the tax" on their returns, for purposes of Treasury Regulation section 1.6664-2(c)(2) and section 6662 of the Code. Accordingly, the Lamprechts substantially understated their income tax for 2006 and 2007 and are liable for section 6662 accuracy-related penalties. *See* § 6662(a), (d).

U.S. taxpayers are subject to tax on world-wide income. *See Huff v. Commissioner*, 135 T.C. 222, 230 (2010) (quoting § 61) ("Gross income for the purpose of calculating taxable income is defined as 'all income from whatever source derived.'"). Under section 7701(b)(1)(A)(i), a lawful permanent resident (such as the Lamprechts were in the years at issue) "shall be treated as a resident of the United States." *See also Cook v. Tait*, 265 U.S. 47, 56 (1924). The Lamprechts omitted all foreign source income from their original 2006 and 2007 tax returns, thereby substantially understating their gross income and corresponding tax liabilities, and in doing so they received the benefit of understated tax liabilities. Furthermore, during the examination of their 2006 and 2007 income tax returns, when the Lamprechts filed amended returns for 2006 and 2007 to report foreign income previously unreported, their representative asserted that Mr. Lamprecht "did not report his foreign source income and earnings on his originally filed returns because he thought that 'everything Swiss was not taxable in the U.S.'"

There is such a thing as an "[e]xclusion from gross income", provided in section 911, which excludes "foreign earned income"; but this exclusion—this tax benefit—is available only for a "qualified individual", § 911(a), which is defined as someone whose tax home is in a foreign country, *see* § 911(d)(1), and Mr. Lamprecht was not such an individual in 2006 and 2007. One could say that the Lamprechts' omission of their foreign source income was an invalid claim of the foreign earned income exclusion under section 911—which amounts to

**[\*26]** claiming a tax benefit whether affirmatively stated on the return or not. To properly claim such an exclusion, one would have to file with his income tax return a Form 2555, "Foreign Earned Income", which the Lamprechts did not file. By their reckoning, apparently the taxpayer who erroneously excludes the earned income and files the Form 2555 thereby makes a damning "affirmative statement" that constitutes the claiming of a benefit (so he is ineligible thereafter to fix the error on a "qualified amended return"); but the person who likewise erroneously excludes the earned income but obscures his omission by *not* reporting it on Form 2555 is deemed eligible to fix the error on a "qualified amended return" and thereby to avoid the penalty otherwise due on his understatement. If this were the rule, it would create a surprising and perverse incentive to hide one's erroneous exclusions. We do not see that "affirmative statement" rule in the text of the regulation, which looks only to see whether the taxpayer "*claimed any tax benefit* on the [original] return directly *or indirectly*". Treas. Reg. § 1.6664-2(c)(3)(i)(D)(*1*) (emphasis added).

### b.    *The caselaw*

As support for their argument that omitting items from a tax return is not the same thing as "claim[ing] any tax benefit," the Lamprechts cite *Colony, Inc. v. Commissioner*, 357 U.S. 28 (1958), and *United States v. Home Concrete & Supply, LLC*, 566 U.S. 478 (2012). In *Colony* the Supreme Court held that understating gross income on an income tax return by misstating costs items or basis is not an "omi[ssion] from gross income [of] an amount properly includible therein" for the purposes of extending the period of limitations under section 275(c) of the 1939 Code (later reenacted as section 6501(e)(1)(A) in the 1954 Code). *Colony, Inc. v. Commissioner*, 357 U.S. at 36–37. The Supreme Court later extended the holding of *Colony* to section 6501(e)(1)(A) in *Home Concrete & Supply LLC*, 566 U.S. at 490. These cases both construe an "omi[ssion] from gross income" for the purposes of extending the period of limitations under section 6501(e)(1)(A); they do not address (even tangentially) the question whether a taxpayer's omissions from gross income constitute the "claim[ing of] any tax benefit on the return directly or indirectly" for the purposes of Treasury Regulation section 1.6664-2(c)(3)(i)(D). The Lamprechts cite these cases for the proposition that "an omission from gross income [is] not the same as an overstatement of basis," and with that we agree. Not every error in tax reporting is the same.

**[\*27]** However, section 1.6664-2(c)(3)(i)(D) looks for a nonspecific "tax benefit". The holdings of *Colony* and *Home Concrete* that a misstatement of basis is not the same thing as an omission of income do not shed any light on how we should construe "claimed any tax benefit"; and we conclude that the broad reach obviously intended by the regulation—i.e., "*any* tax benefit" and "directly *or indirectly*"—tends against a narrow construction of "claimed any tax benefit". Furthermore, in imputing an officer's tax fraud to a corporation, the Court of Appeals for the Tenth Circuit in *Ruidoso Racing Ass'n, Inc. v. Commissioner*, 476 F.2d 502, 506 (10th Cir. 1973), *aff'g in part, remanding in part* T.C. Memo. 1971-194, explained that "[a] tax benefit [to the corporation] could arise in two ways, understatement of income and overstatement of business expense deductions", in concluding that a corporate officer's "failure to report bar income reduced total income and, hence, produced a tax benefit for the corporation." *Ruidoso* did not involve a "qualified amended return" analysis, but it illustrates in its different context the potential breadth of a "tax benefit". We are satisfied that an understatement of income by omission claims a tax benefit within the meaning of Treasury Regulation section 1.6664-2(c)(3)(i)(D).

c. *Affirmative statements on the Lamprechts' amended returns*

The Lamprechts' position about the meaning of "claim[ing] any tax benefit" presumes a clean distinction between a mere omission of income and an affirmative claim of a tax benefit. The actual facts of the Lamprechts' returns, however, do not bear out this distinction. As is often the case, the omission of income from the Lamprechts' original returns affected other reporting on the returns and resulted in their originally claiming—affirmatively, one must say—deductions in amounts to which they were not entitled (and which they later had to reduce on their amended returns).

As is shown on the table *supra* p. 9, the Lamprechts elected under section 63(e) to itemize deductions on their original and amended returns for both 2006 and 2007. The amount of itemized deductions that an individual may claim will be limited by section 68(a) if his "adjusted gross income ["AGI"] exceeds the applicable amount". In 2006 that

[*28] applicable amount was $150,500; in 2007 it was $156,400.[20] Where AGI exceeded those amounts, the greater one's AGI, the greater was the limitation, resulting in increasingly reduced itemized deductions. On their original returns the Lamprechts incorrectly reported AGI of $1,073,652 for 2006 and $1,705,172 for 2007; but on their amended returns they correctly reported much larger AGI of $2,816,833 for 2006 and $6,930,169 for 2007. Consequently, the itemized deductions to which they were entitled were overstated on the original returns for 2006 as $187,338 and for 2007 as $202,497, and they were corrected on the amended returns to $152,481 for 2006 and $128,460 for 2007. That is, on their original returns they claimed excessive itemized deductions of $34,857 for 2006 and $74,037 for 2007—totaling $108,894 for the two years.

In sum, because the Lamprechts incorrectly failed to report on their original returns for 2006 and 2007 almost $7 million of their foreign income, those returns also claimed (one can say "affirmatively claimed") itemized deductions totaling over $100,000 to which the Lamprechts were not entitled. If, as the Lamprechts argue, we must look for "some affirmative statement on the [original] tax return that the taxpayer is entitled to the tax benefit claimed", we find such an "affirmative statement" on the Schedules A to their 2006 and 2007 returns. The Lamprechts' subsequent corrections on the amended returns were their admission that, because of the actual magnitude of their originally unreported income, they were not entitled to those greater amounts of deductions affirmatively claimed on the original returns. Therefore, even under the Lamprechts' narrower construction of Treasury Regulation section 1.6664-2(c)(3)(i)(D)(*2*), their original returns "claimed a direct or indirect tax benefit from the type of activity that is the subject of the [UBS John Doe] summons". As a result, the amended returns—not filed until after the John Doe summons—were not "qualified amended returns"; and we therefore look not to the amended returns but to the erroneous original returns to determine whether there were substantial understatements of "the amount[s] of tax imposed which [were] shown on the return[s]". We hold that there was.

---

[20] *See* §§ 1(f)(3), 68(b)(2); IRS Pub. 501, "Exemptions, Standard Deduction, and Filing Information" at 1 (2006) ("Some of your itemized deductions may be limited if your adjusted gross income is more than $150,500"); IRS Pub. 501, "Exemptions, Standard Deduction, and Filing Information" at 1 (2007) ("$156,400").

**[\*29]** C.     *The period of limitations and the UBS John Doe summons*

    1.    *The ordinary running of the six-year period of limitations*

The returns at issue here were deemed timely filed in April 2007 and April 2008, and the parties agree that the six-year limitations period imposed by section 6501(e)(1)(A) applies. However, the NOD was not mailed until January 2015—i.e., more than six years after the filing of both of those returns.[21] The Lamprechts contend that assessment of the section 6662 accuracy-related penalties against them is barred by the statute of limitations for assessment under section 6501. The Commissioner contends that, under section 7609(e)(2), the running of the six-year limitations period was suspended by the service of the UBS John Doe summons,[22] and the Lamprechts argue that it was not.

    2.    *The parties' positions as to the UBS John Doe summons under section 7609(e)*

Because (as we explained above) the Lamprechts were members of the class of taxpayers identified in the UBS John Doe summons who participated in activities that were the subject of the summons, the Commissioner contends that, pursuant to section 7609(e), the service of the summons suspended the period of limitations for assessment once the summons had remained unresolved after 6 months from service.

---

[21] For 2006 (for which the return was deemed filed in April 2007) the six-year period would end in April 2013, which is 21 months short of the January 2015 issuance of the NOD. For 2007 (for which the return was deemed filed in April 2008) the six-year period would end in April 2014, which is nine months short of the January 2015 issuance of the NOD. The Commissioner's position requires that he show a suspension or extension of the period of limitations of no less than 21 months.

[22] The Commissioner has in fact three rejoinders to the Lamprechts' statute-of-limitations contention, two of which we do not address here: (1) In his motion for summary judgment, the Commissioner asserts that the Lamprechts' failure to file a Form 5741, "Information Return of U.S. Persons with Respect to Certain Foreign Corporations", for an entity called Paro Inc. extended the period of limitations under section 6501(c)(8). Because we hold for the Commissioner on the section 7609(e)(2) issue, we need not reach section 6501(c)(8). (2) The Commissioner contends—but does not advance in his motion for summary judgment—that the period of limitations for assessment is open for the Lamprechts' 2006 and 2007 years under section 6501(c)(1) because of fraudulent positions taken on their original returns. The Commissioner reserves this argument for trial should his motion for summary judgment be denied. The Lamprechts' cross-motion asks us to hold that fraud is absent and does not extend the period; but since we hold for the Commissioner on other grounds, we need not reach this fraud issue.

**[\*30]** The parties agree that the 6-month anniversary of service of the UBS John Doe summons is January 21, 2009, but they disagree as to the date of the final resolution of the summons. The Commissioner asserts that the UBS John Doe summons was not resolved until the IRS formally withdrew the summons almost 22 months later on November 15, 2010. By that reckoning, 22 months is added to the limitations period, and the NOD is rendered timely as to both 2006 and 2007.

The Lamprechts argue, first, that the UBS John Doe summons is invalid and unenforceable because it was issued for an improper purpose and therefore cannot operate to extend the period for assessment under section 7609(e). The Lamprechts also argue that final resolution of the UBS John Doe summons occurred not in November 2010 (when the IRS withdrew it) but rather on August 19, 2009, when the district court entered its order dismissing the summons enforcement case on the basis of the stipulation of dismissal filed by DOJ. By that reckoning, the service of the summons could have added only about 7 months to the limitations period, a suspension that would not render the NOD timely for either 2006 (which needed 21 months) or 2007 (which needed 9 months). We now consider each of the Lamprechts' two contentions.

### 3. *Validity of the summons*

The Lamprechts contend that the John Doe summons did not toll, or suspend, the period of limitations because the summons lacked any valid purpose. Relying on the declaration of the "head of legal and international affairs of the Swiss Federal Banking Commission, a senior position in the Swiss Federal government", the Lamprechts assert that "representatives of the Internal Revenue Service" stated that "the UBS Summons would be issued to interrupt the running of the statute of limitation" and admitted "that no enforcement activity for the UBS Summons would take place as long as discussions were underway between the United States and Switzerland relating to obtaining documents from UBS." The Lamprechts observe that the documents that UBS did eventually produce were the result not of the summons but of a simultaneous request by the U.S. government pursuant to

> the tax treaty between the United States and Switzerland, and not unilateral measures such as the UBS Summons. . . . The IRS stated, however, that they would not withdraw the UBS Summons because the withdrawal would undo the extension of the statute of limitations that it wanted to achieve by issuing the UBS Summons as a

**[\*31]** John Doe Summons. They also wanted to use the UBS Summons as leverage against Switzerland to ensure that UBS met its obligations under the UBS Settlement Agreement.

According to the Lamprechts, issuing a John Doe summons solely to extend the period of limitations for assessment is an improper purpose which undermines its validity and vitiates any effect it might have had on the period of limitations. The Lamprechts cite *United States v. Powell*, 379 U.S. 48, 58 (1964), for the proposition that an improper purpose is "to harass the taxpayer or to put pressure on him to settle a collateral dispute,[23] or for any other purpose reflecting on the good faith of the particular investigation."

However, the Supreme Court's opinion in *Powell* addressed a validity challenge by the summoned party in the district court summons enforcement proceeding, not by a class member in his own later tax case. The Lamprechts cite no authority for their doubtful propositions (1) that, after a district court has approved the validity of a John Doe summons for purposes of enforcement against a record-holder (here, UBS), the validity may later be challenged by a taxpayer in the John Doe class (here, the Lamprechts) in his own collateral proceeding,[24] nor (2) that a consequence of a successful challenge of invalidity by a member of the John Doe class would be that the summons would have no effect on the period of limitations. In the instant case, both UBS and the Swiss government were alert and well aware of the district court suit for enforcement of the summons, and there is no reason to suppose that they overlooked a colorable challenge to the validity of the summons at the time and that we therefore ought to remedy their oversight by entertaining such a challenge from a member of the John Doe class. But if we were to entertain that challenge here, we think that the Lamprechts have not made a showing to support the premise of their

---

[23] Because the summons at issue was a John Doe summons, it could not have been issued with an intention to harass in particular the Lamprechts (about whom the IRS was apparently ignorant) or to pressure them to settle any collateral dispute. Rather, the Lamprechts contend that the improper purpose in this instance was the extension of the period of limitations.

[24] *Cf. Tiffany Fine Arts, Inc. v. United States*, 469 U.S. 310, 321 (1985) ("[Section] 7609(f) provides no opportunity for the unnamed taxpayers to assert any 'personal defenses,' such as attorney-client or Fifth Amendment privileges that might be asserted under §[] 7609(a) and (b) . . . . What § 7609(f) does is to provide some guarantee that the information that the IRS seeks through a summons is relevant to a legitimate investigation, albeit that of an unknown taxpayer").

**[*32]** challenge: They have not shown that the IRS's sole purpose for the UBS John Doe summons was extending the period of limitations for assessment, nor that doing so was an improper purpose.

The Lamprechts' own characterization of the IRS's purpose was two-fold: The IRS "wanted to achieve . . . the extension of the statute of limitations . . . by issuing the UBS Summons as a John Doe Summons. They [i.e., the IRS] *also wanted to use the UBS Summons as leverage* against Switzerland to ensure that UBS met its obligations under the UBS Settlement Agreement." (Emphasis added.) The IRS had two potential means[25] to obtain information from UBS—i.e., the John Doe summons and the U.S.-Switzerland Agreement provisions—and it employed both. The extension of the period of limitations was one of the congressionally intended effects of the John Doe summons, and the IRS employed the John Doe summons in order to take advantage of that consequence, lest its investigation be rendered moot before it could be completed. But the IRS also (by the Lamprechts' account) used the pendency of the summons as leverage to prompt Switzerland to cooperate with the production of information under the U.S.-Switzerland Agreement. The fact that the information was eventually produced pursuant to the U.S.-Switzerland Agreement is no indication that the John Doe summons was not helpful to that production and is no indication that the summons was not issued in good faith.

The 2009 OVDP and the district court's holding that the UBS John Doe summons satisfied the requirement of section 7609(f) indicate the good faith nature of the IRS's investigation into U.S. taxpayers with unreported foreign income. Furthermore, the decision of the parties to the enforcement suit to leave the UBS John Doe summons open indicates that suspending the statutory period for assessment was not the sole purpose of the summons; rather, the IRS was evidently working to obtain information (and to maintain its ability to do so). In addition, leaving the UBS John Doe summons open was also obviously meant to assure compliance with the request for information specified in the U.S.-Switzerland Agreement, as is evidenced by the IRS's eventual withdrawal of the summons after the information was obtained from

---

[25] Where the law grants two means, it is not inherently improper for a party to employ both means. For example, a taxpayer may sometimes properly pursue information from the IRS both through civil discovery in litigation and through a request under "FOIA"—the Freedom of Information Act, 5 U.S.C. § 552. Under FOIA he may avoid objections of irrelevance that might hinder discovery requests, but using FOIA to avoid a relevance dispute is not improper.

**[\*33]** UBS through the agreed channels.  We see no impropriety in the UBS John Doe summons.

We hold that the six-year statute of limitations for assessment under  section 6501(e)(1)(A)  was  suspended  by  the  operation  of section 7609(e) because of the issuance of the UBS John Doe summons.

### 4.    *Final resolution*

Treasury Regulation section 301.7609-5(e)(3)[26] provides:

> For purposes of section 7609(e)(2)(B), final resolution with respect to a summoned party's response to a third-party summons occurs when the summons or any order enforcing any part of the summons is fully complied with and all appeals or requests for further review are disposed of, the period in which an appeal may be taken has expired or the period in which a request for further review may be made has expired.

The Lamprechts contend that final resolution of the UBS John Doe *summons* occurred on August 19, 2009, when the district court ordered dismissal of the summons enforcement *suit* following entry of the stipulation of dismissal.  (They suggest no alternative date.) However, the settlement agreement between the parties to the enforcement suit specified that dismissal of the suit would "in and of itself, have no effect on the UBS [John Doe] Summons or its enforceability" and contemplated compliance with the *summons* after dismissal of the *suit* through the method agreed to in the US-Switzerland Agreement.  Because the UBS John Doe summons was not yet fully complied with at the time the enforcement suit was dismissed, that dismissal of the suit was not the final resolution of the summons.

The Commissioner contends that final resolution of the UBS John Doe summons occurred when the IRS formally withdrew the summons on November 15, 2010, after receiving the requested records from UBS through the means agreed to in the U.S.-Switzerland Agreement.  The Lamprechts do not assert (nor make any showing of) an earlier date by which UBS had "fully complied" with the summons and "all appeals or requests for review" had been "disposed of".  Accordingly, on the record before us, we hold that final resolution occurred upon withdrawal of the

---

[26] Applicable as of April 30, 2008.  Treas. Reg. § 301.7609-5(f).

**[\*34]** summons on November 15, 2010. Accordingly, the periods of limitation for assessment of tax for 2006 and 2007 were suspended by section 7609(e) from January 21, 2009, to November 15, 2010 (i.e., for 664 days), and thereafter the periods of limitation for assessment of tax (as suspended) were set to expire on February 7, 2015 (for 2006), and February 7, 2016 (for 2007). Before those expiration dates, the IRS mailed the NOD to the Lamprechts on January 9, 2015, within the statutory period for assessment, and therefore assessment of the section 6662 accuracy-related penalties for 2006 and 2007 is not barred by the statute of limitations.

III. *Conclusion*

Finding no genuine dispute of material fact, we will grant the Commissioner's motion for summary judgment, will deny the Lamprechts' motion for summary judgment, and will enter decision for the Commissioner as a matter of law.

To reflect the foregoing,

*An appropriate order and decision will be entered.*